Mr. Turner, are you ready to proceed? I'm sorry, is the lawyer for Global Marine Exploration ready to proceed? Mr. Turner, can you turn on your video? All right, take your time, Mr. Turner, it's fine. I have some very good assistance this morning, I wouldn't know how to do it, I'm afraid. I think that we've got her now, let's see. You let us know when you're ready, Mr. Turner, it's fine. Yes, ma'am, I think we're ready. Are we ready, ladies? Yes. All right, Mr. Turner, are you ready to proceed? You have 10 minutes for your argument and you have five minutes for rebuttal. Thank you, Your Honor. Stephen Turner for the appellate. I appreciate the court allowing me to appear virtual given my sudden turn of events health-wise. In enacting 28 U.S.C. 1605A2 in 1976, Congress provided that a foreign state shall not be immune from jurisdiction of the courts of the United States in any case in which the action is based upon a commercial activity carried on in the U.S. by the foreign state regardless of its purpose. In doing so, Congress specifically intended to codify the restrictive theory of foreign sovereign immunity that was followed by the State Department and applied in the United States since the early 1950s. In contrast, domestic governmental entities like the state of Florida enjoy full immunity from any action or activity they may conduct in the United States absent specific waiver. This is a completely distinct from the concept of restricted sovereign immunity. Pursuant to the restrictive theory, a foreign state has no immunity from suit based on any activity that private persons perform or can perform or that involve private means and manners of performance even though the purpose of the activity may promote the public welfare or national interest of the foreign sovereign. Mr. Turner, let me ask you to address the issue I have with your position. I think this is a fair statement. It's difficult to figure out what the Republic of France has effectuated. Could you identify for me what the commercial act is that the lawsuit is about? Judge, it is talked about in the orders of the lower court. It is really activity rather than a specific action, but it is activity of the France in undertaking a project for archaeological recovery of the artifacts. It includes agreements. It includes negotiations. It includes agreements with others to do work. It includes supervision. It includes all these aspects of the project that would normally happen. I haven't described it. I'm sorry I don't have the exact specific portion of the record which is described by the lower court. You're appealing the lower court's order, so I assumed you didn't agree with the lower court's position on that. The lower court adopted my description, but it was a short form. It wasn't the entire length of the description. A recovery project is to go out and do all the work, raise capital, do the things that you do in order to get the recovery effectuated. Part of the problem is when they negotiate this deal, they cut us out of the non-French property. Because under your contract with the state of Florida, you get a percentage of the salvage of the recovery. That's correct. While there may be dispute as to whether we would have any such rights on the French property, it's clear we would have the rights on the non-French, the other shipwrecks, the other five shipwrecks. What has France done that has led to your lawsuit? You said it was recovering or initiating a recovery of the sunken vessels, but as far as I could tell from the complaint, they haven't done that. You're suing over unjust enrichment, misappropriation of trade secrets, and some other similar theories. None of that has to do necessarily with the recovery of the sunken ship. Most certainly it did, Your Honor. Most certainly it did. It was part of their action to recover the ship. In doing all this, and the cases talk about negotiations coming into America, negotiating. All of that is part of it. We cited cases where they violated intellectual property rights. Aren't you seeking the imposition of a marine Linn on the race? Not on the race. No, sir. No. No, this is impersonum. You can't have a jurisdiction. You can't. We can't be here in Purim under 1605. This has to be impersonum, and it is impersonum. It is for compensation for our services, which have contributed to the recovery. You can't have any more action than we've got in this case. All of this. In the 28-1605B, a foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which in a suit for admiralty is brought to enforce a maritime lien against a vehicle or cargo of the foreign state, which maritime lien is based upon commercial activity of the foreign state. My understanding is, is under the law of salvage operations, or whatever you want to call it, internationally and in Florida, under maritime law, U.S. maritime law, that a party engaged in salvaging a race like this would have a lien for work done on the project. Is that not right? Your Honor, we're not here on that. No, forget what we're here on. Our services, when it contributes, and this court spoke to it through Judge Kravitz. This court spoke to the incoherent lien that arises when the recovery is effective, that the person who contributed to that then has a right to say, listen, I've contributed to this effort that you're now doing. Are you telling us that your complaint doesn't include that at all? No, sir. It does include that. It does? Yes, sir. It includes this incoherent lien right. That's what I'm talking about. I'm talking about the lien that is recognized in maritime law in your position. Yes, sir. This is an enforceable impersonal because it's contributing for services rendered to the project. What happened is when once France makes the recovery, we have the services we have rendered now become valuable and they have accepted our services in doing so. So that's the theory played here. There's four theories, four damages or four harms caused by this project. You don't have any in remedy in this case is what you're saying? Oh, absolutely not. We're not here. We could not be in here because this is strictly under 1605. Uh, which is an impersonal under the constitution. So we're here, uh, strictly on that. Um, Judge, well, I want to go subsection B is not an impersonal provision, but we're not here under that. Your honor. We're under, we're okay. We're not here under a lien. We don't have a lien. We don't have admiral jurisdiction. This is, this is in person. Okay. There's pressure. I hope I answered your questions. I'm not sure if I did or not. Um, because this, this, well, I guess here's the, here's the concern I have, which I, I mean, you answered the question, but, um, it's just my understanding from the complaint that, that France hasn't actually, um, lifted the ship out of the water, right? That they're in the preliminary stages of this. Um, what are we to do with that? I mean, if, if, if the commercial activity is the exploration, the development of the whatever's down there, you know, it's not the debris, I guess, of the ship, the potential exhibition of that. I mean, it doesn't seem like that's happened yet, I guess is my concern. What, there is no ship because the ship's long since, it's a good ship, it's long since gone, but we believe there are and have documented certainly valuable artifacts, uh, through photography and so forth and in the water and what we know. And we suspect from the manifest of these ships, uh, and the ships at the time of what they're carrying. So there's some feel for what's down there. Um, but, uh, the, this is an ongoing project. It starts with negotiations. It starts with cutting us out of the deal, um, and, and it starts with usurping our, I guess, Mr. Turner, is there, is there any case that, that suggests that, uh, the commercial activity has to be completed? Well, this is a declaratory judgment. We, we can get a declaratory judgment that this derives for the future, which we would have, um, and you can estimate value. And salvaging, salvaging or recovery is something that a private entity can do. It's not necessarily, it's not like issuing a bond or doing something correct. It would be, uh, it could be a commercial activity. GME, the plaintiff itself, that's what we do. That's what we do. I see my time is up, Your Honor. Well, I, I, I, I'm going to let you have a little more time. Um, I guess the, the, the question is if, if we were to agree that this was a commercial activity, what is the ultimate, um, I think you said that you had four theories of harm. Is that what you said? Yes, sir. Yes, ma'am. So what, what is, what is the ultimate outcome that, that, uh, Global is looking for? Well, we would go back, uh, and, and establish that we had these services that we have rendered or that, that, that, that, that our rights to locate these ships were taken from us and that, and that France has gained the value of this and that we are entitled to some compensation, uh, for that effort. So we would be seeking compensation essentially for services. We have done over $5 million of, of, of, of, of, uh, actually expended to us in finding these ships. The finding of the ship is lost for 465 years is a big deal. And then the, the, the ship, the Trinity is one of them, but you said that there were six other ships. Are these six other ships? Were they part of the, of, of that group where they're there? Do they belong to France as well? Or are they, they are, we don't know what they are. Well, we, we do believe that it's been documented by virtue of the artifacts, by virtue of the anchors and various things that you can identify things. These are not part of these ships. They're they're historic shipwreck sites would be recovered. This is a, this is an interesting case, uh, with a lot of twists and turns, but we did a lot of work to find these ships that have not been. And are you excluded from all six ships or are you excluded only from the Trinity? We, we're excluded from all of them. The state of Florida and, and, uh, and the France has undertaken to do this recovery project together and they cut GME out altogether. Okay. That's, thank you, Mr. Turner. And I'll let you have five minutes for rebuttal. Thank you, your honor, James Gould on behalf of the Republic of France. Fitting and ironic that I'm here now in what was once the capital of the country of new France only 457 years ago, but I'm not here to try to. I think only for a few, only for a few days, because I think the Spanish took care of that. They did take care of that. And so I'm not going to try to undo that. All I'm asking for today is affirmance of a district court decision that is solidly grounded in Supreme court precedent and the decisions of the 11th circuit and the factual record, which is that France and Florida agreed, both recognized from the start in the underlying case, that this is a unique, irreplaceable time capsule of a pivotal event in Florida, European history. If there had not been a hurricane, what, what, what would this place be like now? Would it be French? We don't know. Why are you not doing the same work as a salvage operator? No, because it's property of France. Well, no, I know, I understand that. And we're not. How about the physical work? Pardon me? There's been no work. That is completely incorrect. There is an agreement by France and Florida as sovereigns with the duty, statutory duty to protect that. There will be work done. It hasn't happened yet. For now, there is an agreement by... But does work have to be done? That's the question, because at the end of the day, we have to look at what the action is. And if it's commercial activity, tell me exactly how what the Republic of France is doing is not commercial activity. Because it is an exercise by France with respect to its military property. This was a warship and under the cultural patrimonies of the law of France. That's in the record, the declarations of the French representatives that are just like what the United States does when it is a military ship or a property, a historic property. Are you contending that the case is not ripe because France hasn't done anything yet? No, I do think it is ripe. It is ripe. Because there's been no commercial activity. No, but you're going to engage in the same activity, are you not, that a salvage operator would? That's an agreement between France and Florida. No, I'm talking about the physical activity. How would it differ from what the salvor would do? Physically, yes, it would involve going down in a boat. But bear in mind also, Your Honor, that this is not the first case. They came forward with a claim in rem for that ship, and they lost. The middle district decision is final. They didn't appeal. And it held that this is property of France. And France may proceed. It could be property of France. But the Right. Okay, but here, are you suggesting that the Republic of France what they're going to do by taking out the ship, or the six ships from the water and salvaging them is something that is sovereign power? Yes. First of all, how can you possibly say that? How can you possibly say that? Because that's something that salvage companies do throughout the world. There are commercial pilots who can fly Air Force One, but that doesn't strip Air Force One of sovereign immunity. France exercised, and the case law is replete, and it's in our brief, a distinctly sovereign power to claim, first of all, sovereign immunity. No one else can do that. No private party can do that. That's a sovereign act in itself that takes this out of this whole realm is this commercial activity. Second, commercial activity, as always defined in this court, is a sovereign acting like an ordinary person in the market, not like a sovereign. France is acting to protect its irreplaceable historic property and share it with another sovereign, the host sovereign, the state of Florida. This is not commercial activity. The district court specifically found that no one has entered the market. No one has engaged in trade or commerce. Let me ask you this question. So I think this is a tricky case because usually these cases come up and there's some kind of contract claim at issue. And so that's the question of the commercial act. But here, it's basically a tort claim. So the claim, the way I see it is that it's sort of tortious interference with the contract. It's misappropriation of trade secrets. It's that kind of thing. How is it not a commercial act to interfere with commerce? So if that's what's going on here, if France has interfered with a commercial relationship between the salvage company and Florida, how is that in and of itself not a commercial act? First, as a matter of the background facts, GME's permit was revoked by Florida for damaging this site. But that's a France came in and asserted its sovereign immunity, that this is a shipwreck cloaked with the sovereign immunity of France, and that it is the property of France. And the first district court decision in the underlying case concludes France may proceed with recovery together with those acting on its behalf. That's raised judicata, and Florida has been shoulder to shoulder with salvage was the claim GME made in that first case, and they lost, and they did not appeal, Your Honor. So that's out of the picture. There's no turning back. I mean, what about the misappropriation of trade secret? So I mean, if I understand the claim correctly from the other side, it's basically we had this agreement with Florida that we would find this stuff. We shared information with Florida pursuant to that agreement. And lo and behold, France came in, interfered with our agreement, took our trade secrets, is using our information to their own advantage, and they owe us some money because that's effectively a tort. If that's what you did is interfere in a contractual relationship, commercial contractual relationship, how is that not itself a commercial act? Well, it's first of all, it's not a commercial act if it is an assertion of a statutory obligation of the French Ministry of Culture to protect French military property. Why not? Why does that matter? As far as the facts are concerned here, GME, and it's in the record, the materials they submitted, they were required to provide a report to Florida, which included these specific alleged trade secrets, and they put it in the public record, both in the underlying case and again in this case. And they have no basis to say that France misappropriated information that they were obligated to provide the state of Florida. Yeah, I mean, I think it may be that the claims on the merits are weak, I guess. Let's just assume, let's assume that France, you know, this is a ridiculous hypothetical, but just, just bear with me. I mean, let's assume that France sent a secret agent to break into Coca-Cola's special vault and, you know, absconded with Coca-Cola's special formula, right? So it's just a, it's a misappropriation of a trade secret. And France hasn't started making its own Coca-Cola yet, but, you know, Coke thinks they're about to, right? Is that tort, is that misappropriation of a trade secret, is that a commercial act because it interferes with the commercial sort of conduct of an American company? Unless France had a, or whatever nation, I don't want to pin this on France, had a overpowering or superseding sovereign right, then presumably it would. But that's not this case. And I would particularly want to refer the court to the case that the district court relied upon heavily because it is so parallel. Barnett versus Greece, where a Greek, ancient Greek statuette was at Sotheby's about to be auctioned in New York. And Greece invoked its national law that this is the property of Greece. They issued a letter and blocked the sale. And the district, the Second Circuit held there, just as the district court held here, that an action in terms of the elements of 1605 A.2, they must be based upon a commercial activity. The activity here that knocked GM out of the picture was the invocation by France of a superseding sovereign right, a distinctly sovereign right. And at the end of that decision in the Second Circuit, and I commend it to you, there's some very sharp language where the person who had owned or was about to sell that statuette said, well, gee, maybe they're going to sell it. And that would be commercial activity, and I ought to get a share of that. And the ruling was, and it's very clear, no, the Sovereign Act does not lose its nature if a party imagines some commercial activity downstream. But that's not the case here. This is unbelievably important time capsule that deserves to be protected, and it's the statutory obligation of national heritage laws and Ministry of Culture. And Florida is in perfect line step. Let me read, if I may, what the Declaration of Intention, and that's all it is, is a Declaration of Intention says. France and Florida are, quote, committed to the preservation and conservation of the vestiges of the trinity discovered off the coast of Cape Canaveral in order to transmit to future generations historical testimonies of this exploration of Florida by Jean Rebond. Again, the Supreme Court has made it very clear that whatever the motive is, is irrelevant. The issue is whether the particular actions that the foreign state performs, whatever the motives behind them, are the type of actions by which a private party engages in trade and traffic or commerce. That's the issue. That's the question. The motive is irrelevant, or the purpose is irrelevant. The question is the type of action. I agree up to a certain point, Your Honor. That's, for example, what Weltover says, where Argentina was selling bonds. There are the cases also where a sovereign exercises its sovereign authority, and when it is a peculiarly distinctive, distinctively sovereign authority, even if it's appropriation of property, as this court, the 11th Circuit, has repeatedly held, Devon Gochoa, others, that's a sovereign act that takes it out of the commercial realm. But the district court here and its rulings are subject, we submit, to review only for clear error. I won that proposition in the Odyssey Marine case, where on behalf of Spain, against a company that brought 17 tons of gold and silver to this country from a Spanish shipwreck. It's clear error, highly deferential. Is the ruling, are the factual findings plausible? Well, I think both of you got the standard of review partially correct and partially wrong, because I think we're at a 12-B-1 motion here. Am I incorrect? Yeah, but where it is a factual challenge. And the legal conclusions are subject to de novo review, and the factual, I agree that the factual findings are clear error, but legal conclusions are de novo, correct? Agree. Yes, Your Honor. Okay. All right. But we submit that it's virtually, it is incontrovertible that there has been no commerce by France, and the idea that GME is advocating, well, but somebody else engages in that as commercial activity is... Counselor, what you're saying is France engaging in what a salvo would do, this is when you get going, is not a commercial act. Right, if France is doing it... If a salvo does it, it's a commercial act. If France is doing it to protect its property for public purposes... If it's a salvo doing it, it's a commercial act? Yeah, there are companies that are in the business... If a salvo is doing the work to salvage, to acquire the property, the race, is that a commercial act? If the salvo is in the commercial business... Well, let's put it this way, were they engaged in a commercial act to start with? Are you speaking of GME? Yes. If I may ask, they had a license to explore but not to excavate... Was it a commercial act what they were doing physically? I suppose so, Your Honor. I know they were not a charitable entity. I understand that, they weren't a charitable entity, but they were engaged in a commercial act. They were. Okay, let us assume that. Your argument is, is because France is not like a salvo but is doing the same act, it's nevertheless immune. Yes, same as when somebody who had a Greek statuette was going to auction it at Sotheby's and the Greek government said, no, we have a patrimony law, this belongs to us, we have that power and we've exercised it. That's the second circuit and we're not bound by that. Oh, yes, that's right. Agreed. But the district court here, first case which was not appealed, it's fixed and final, dusted and done, that this is sovereign immune property of France and France may proceed with recovery. That's in the first case. Let me give you a hypothetical. Yes, sir. Suppose this wreck was a United States ship and the plaintiff in this case was down there and they found it and spent a bunch of money at doing it. And then there was an NREM proceeding and the court determined that it was a U.S. vessel. Could the United States avoid paying the salvo for the expenses incurred? Yes, and this court has so held. International aircraft recovery. The reason would be because it would be a taking. No, it's because it's property of the United States and the salver can only act against an owner of a ship with the consent of the owner. I understand that, but the salvo has a lien in the property, a maritime lien, do you agree? Theoretically, but we've won that. Theoretically. We've won that. Theoretically, what I'm saying, it's a property interest. It's inchoate, but it's a property interest. Yes, a salvage award is enforced by a property interest. All right, so that if the United States took the ship and didn't pay the salvo, it would be taking its property interest and the Fifth Amendment would preclude that. Isn't that right? This court held in international... Now forget what we held. Would it not be taking an interest, a property interest? I can't speak to the United States law about that. All I can say is... Well, let's put it this way. An inchoate lien is a property interest. Do you agree with that? In the abstract, yes. In the abstract, yes. Okay. And so if the United States took the property and didn't honor the interest, it would be a taking. In theory. In theory, but I'm not competent to speak about the United States law. I represent France, and France is acting under its national cultural patrimony law and to protect its military property. Judge Legault, do you mind if I ask one additional question? Of course, Judge Fraser, you may. So one of the things that the district court... There were two elements to the district court's ruling. One was the commercial act and the other was the based on language. Could you just talk a little bit about the based upon language? So the other side says, look, our suit is about, is based upon France's intentions to salvage this ship, bring up this ship, do stuff with this ship. How do you see that analysis? I think the district court got it quite right when it said that the based upon moment was when the district court ruled in the first case and it became final. Because that cut off any property interest of GME in this time capsule. And that's what you look at, not whether there was some commercial activity that might occur later. That's Saudi Arabia versus Nelson. That is OBB, Persona, and Verker Supreme Court cases. It is the district court decision here, of course, and it is the Second Circuit decision where a nation invoked its cultural patrimony. And it didn't matter if the owner of that statuette or the auction house said, gee, we think next year they're going to auction it commercially. No, they exercised a property, a distinctively sovereign right. The Devon, I can never pronounce these, Gauchoa case and a Venezuela case in this circuit have also held that when a sovereign exercised a national property right, even if it appropriates property in Peru or Venezuela and the owners here, it's a sovereign act and it's not a commercial act. If it's distinctively sovereign, it's distinctively sovereign. Thank you, Mr. Gould. Thank you for your argument. It's a very interesting case. Mr. Turner, you have five minutes for rebuttal. Thank you, Your Honor. The in-race act has nothing to do with this case because that is a 1609 jurisdictional issue, where if you have any foreign property, then admiralty jurisdiction does not lie in race. And all that was held there was this is a French ship, so we can't go any further. There's no jurisdiction here. There's no subject matter jurisdiction under 1609, and that's the end of the inquiry. It has nothing to do and it's not race judicata. It's not anything. It's simply a declaration that the ship belongs to France. Well, we don't challenge that and France is now recovering its ship. It's the recovery action that gives rise to our action. It's all the things that France has done in connection with their recovery from day one, negotiating for the right to recover from the state of Florida on forward and all that it will do. And that's what we're talking about. Barnett has nothing to do with this case. We've several places have in our briefs have distinguished that Barnett case in the second circuit. Not only is it not something that Mr. Turner, you're looking, you're looking to be, are you not just looking to be paid for the money spent by your client? Yes, sir. That's what you want is the money that was spent to be paid for the services we've rendered. I understand. Yes. Okay. And the Barnett case, the Barnett case has to do, there's no commercial. I'm sorry, your honor. I'm sorry. All I'm trying to do is find out what is the source of the obligation or your right to be paid. Just a simple source. The source of the obligation is the actions arise by virtue of France's actions in connection with their recovery. Oh, you've got your, your source is a tort source. It's not a maritime. Is it just a tort law source? It's a tort, but it's also for services rendered. So it's a, it's been, you know, for services rendered would be based on maritime law. Yes, sir. The pardon, but you can also have a common law action for services rendered implied right. It gives rise to my services. When you accept them, you fixed it effectively, implicitly by getting the benefit of it. That's not a tort action. No, sir. I think we've got two types of actions here. Well, that's an action based on the maritime right that you had. That's what I'm trying to say. I try to throw you a softball. I know I appreciate that. Yeah. When you, when I asked you earlier on, when you were making your argument, you were running away from that point. No, I'm not running away. I'm, I'm everything I've outlined in my brief. I stand on 100%. This is, we've researched it. It's based on your, your client's involvement in finding the, the wreckage, et cetera, et cetera. And all that was suspended. Surveying it. And France, France should not be able to take the property without paying you. That's about the same. Without paying for our services. Without paying for the services. That's it in a nutshell, isn't it? Yes, that's really is. That's the, that's the nut of it. I do want to say one thing about Barnett because Barnett, the whole holding in Barnett was the action, the action that is involved was taken overseas and therefore was not commercial activity in the United States. So Barnett is not applicable here. There was a classic action of nationalization of property. That is a sovereign function when you nationalize property under, under, you know, you effectively take it from your citizens. And that's one of the things that makes it particularly solid. There was no peculiar sovereign activity in connection with the recovery here. That's why it's commercial. Thank you, Your Honor. I appreciate the court's attention on this. Thank you to both of you. It's a very interesting case. Have a wonderful day.